IRENE D. MAILHIOT *vs.* LIBERTY BANK AND TRUST COMPANY
& another.[1]

Suffolk.    March 18, 1987. — July 23, 1987.

Present: ARMSTRONG, CUTTER, & SMITH, JJ.

*Contract,* Employment. *Damages,* Employment contract, Attorney's fees.
*Unlawful Interference. Evidence,* Value, Earning capacity.

In an action arising from the discharge of an employee of a bank in which
the evidence was sufficient to permit the jury to infer that the bank's
president acted with the requisite malice to support a claim against a
superior of tortious interference with an employment relationship, the
judge correctly denied the bank president's motion for a directed verdict;
furthermore, the judge correctly instructed the jury that the former em-
ployee could recover from the president for the emotional distress that
the discharge caused her. [527-528]

In an action arising from the discharge of an employee of a bank in which
the jury, on sufficient evidence, returned a verdict against the bank's
president on the plaintiff's claim of tortious interference with her employ-
ment relationship, the judge erred in allowing the plaintiff's motion to
broaden the jury's verdict against the bank's president by imputing his
tortious conduct to the bank. [528-529]

In an action against a bank and its president arising from the alleged wrongful
discharge of an employee of the bank, it was held that, in the circum-
stances, certain testimony of the plaintiff as to projected earnings in-
creases that she failed to receive due to the discharge, which preferably
should have been excluded from evidence, could not be said to have
worked a prejudice against the defendants so as to warrant a new trial.
[529]

In an action arising from the plaintiff's discharge from her at-will employ-
ment by a bank, where the jury, on sufficient evidence, returned a verdict
against the bank's president on the plaintiff's claim of tortious interfer-
ence with her employment relationship, the plaintiff was not entitled to
recover from him the attorney's fees that she had incurred in prosecuting
her unsuccesful claim against the bank, since, as an employee at-will,
she had no contractual rights to enforce against the bank, and thus could
not have been forced by the president's tortious conduct to seek vindi-
cation of such rights. [530-532]

[1] T. William Fitzgerald.

CIVIL ACTION commenced in the Superior Court Department on June 23, 1980.

The case was tried before *Barbara J. Rouse, J.*

*Joan A. Lukey* for the plaintiff.

*Michael E. Hager* for the defendants.

ARMSTRONG, J. The plaintiff (Mailhiot) brought this action in the aftermath of her discharge in 1977 from the position of treasurer of Liberty Bank and Trust Company (the bank). Her complaint had two counts. The first was against the bank for wrongful discharge, predicated on an assertion that her discharge was in retaliation for alerting the State's bank examiners to various banking improprieties and thus was in violation of public policy. See *Gram* v. *Liberty Mutual Ins. Co.*, 384 Mass. 659, 668 n.6 (1981); *DeRose* v. *Putnam Management Co.*, 398 Mass. 205, 208-210 (1986). The second count was against one Fitzgerald, the bank's president, for tortious interference with both her employment with the bank and her prospective employment opportunities at other banks. The case was tried to a jury, which found for the bank on count one and for Mailhiot on count two. It assessed damages against Fitzgerald of $95,000. The judge then allowed a motion by Mailhiot to extend the verdict against Fitzgerald to the bank on agency principles; as a result judgment was entered against both for $95,000, with interest. The judge denied Mailhiot's motion for an assessment of counsel fees and disbursements against the defendants — these being claimed in the amount of $95,731.69. All three parties appealed.

Not surprisingly, the evidence was in sharp conflict as to the circumstances and frictions that led to Mailhiot's dismissal. The defendants adduced evidence that sketched Mailhiot as moody, inconsistent, abrasive, and hostile — not at all one given to patching over differences and cooperating for the good of the organization. Mailhiot saw herself as the guardian of banking integrity, resisting at every turn what she viewed as the fast and loose practices of Fitzgerald. When, in protest, she refused to sign treasurer's reports, took to reporting improprieties to the bank examiners, and refused to report other than directly to the bank's board of directors, either Fitzgerald's departure or hers was inevitable.

The circumstances of her discharge were as follows. Mailhiot, refusing to sign treasurer's reports, insisted on speaking directly to the board at its next meeting. Fitzgerald forbade her attendance. Lien, the new chairman of the board (the bank had been sold after Mailhiot had been hired[2] nine months before) backed up Fitzgerald. At the meeting Fitzgerald distributed a memo from himself containing a list of specific instances of misbehavior alleged against Mailhiot, coupled with a recommendation that she be discharged. The board so voted.

There was evidence from which the jury could find that certain of the allegations of misconduct were fabrications by Fitzgerald: his claimed sources did not support his testimony at the trial. From this the jury could properly infer that Fitzgerald acted with the malice that is required to support a charge against a superior of tortious interference with an employment relationship. See *Gram* v. *Liberty Mutual Ins. Co.*, 384 Mass. at 663; *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 272-273 (1977), and cases cited. For that reason Fitzgerald's motion for a directed verdict was correctly denied.[3]

---

[2] Rehired, actually. She had been an assistant treasurer of Liberty from 1971 to 1973, then resigned to become treasurer of another bank. She became discouraged when passed over for promotion and returned to Liberty in 1976.

[3] Mailhiot failed to prove that Fitzgerald (or anyone else at the bank) damaged her prospects for future employment by any action beyond her discharge. There was no evidence, for example, that Fitzgerald gave Mailhiot negative references in response to inquiries from prospective employers. Without impermissible speculation, inferences to that effect could not be drawn merely from Mailhiot's lack of success in obtaining other employment. Compare *Chemawa Country Golf, Inc.* v. *Wnuk,* 9 Mass. App. Ct. 506, 511 (1980) (golf club, claiming that the defendant was driving away members, did not produce any witness who had resigned from the club due to the defendant's actions), and *Botkin* v. *Miller,* 190 Mass. 411 (1906) (barber picketed for failure to close on a religious holiday; no showing that the loss of business was due to anything other than customers of that faith not wishing to patronize a barber who disregarded such a holiday). Contrast *Owen* v. *Williams,* 322 Mass. 356 (1948), where the defendant physician maliciously removed the plaintiff nurse from the list of special nurses at a hospital. The court, at 359, found that being on the list provided fairly reliable access to employment. Similarly, in the Gloucester fishermen cases (*Pino* v. *Trans-Atlantic Marine, Inc.*, 358 Mass. 498 [1970], and *Pino* v. *Protection Maritime Ins. Co.*, 599 F.2d 10 [1st Cir.], cert. denied, 444 U.S. 900 [1979], on remand, 490 F. Supp. 277 [D.

On this count the jury were correctly instructed that Mailhiot could recover for the emotional distress that the discharge caused her. *Lopes* v. *Connolly,* 210 Mass. 487, 495 (1912). *Doucette* v. *Sallinger,* 228 Mass. 444, 449 (1917). *Gould* v. *Kramer,* 253 Mass. 433, 440 (1925). Restatement (Second) of Torts § 774A(1)(c)(1979).[4]

It was error, however, to allow the motion to broaden the verdict on count two by imputing Fitzgerald's tortious conduct to the bank. In effect, the bank thereby was held liable for tortiously interfering with Mailhiot's employment relation with itself. That result is conceptually incoherent. Discharge of an employee in some circumstances may subject the employer to liability for breach of contract or for wrongful discharge, but the employer cannot be liable for tortiously interfering with the employee's employment contract with the employer. *Gram* v. *Liberty Mutual Ins. Co.,* 384 Mass. at 663 n.3. *Appley* v. *Locke,* 396 Mass. 540, 543 (1986). Restatement (Second) of Agency § 248 comment c (1958). For the reason stated in note

---

Mass., 1980]), the prospective employers of the plaintiff fishermen were identified and had been told that their insurance would be restricted or more expensive if they took the plaintiffs on. The judge's instructions to the jury (to which there was, in this respect, no objection) were that damages under count two were to be computed in the same manner as damages would have been computed against the bank under count one, had the jury found liability on that count. Thus, the failure of proof with respect to prospective employment opportunities could not have affected the integrity of the award of damages.

[4] The defendants claim several other errors in the charge to the jury. Some of these pertain only to the claim of interference with prospective contractual relations and thus are moot. See note 3, *supra.* The defendants' requested instruction that Fitzgerald could only be liable if he fired Mailhiot solely out of malice was adequately covered. The defendants requested an instruction that Mailhiot's insubordination was a defense. Since the jury had already been charged that Fitzgerald could only be liable if he had acted solely out of malice, there was no prejudice from the lack of such an instruction. The defendants requested instructions that a superior officer has a privilege to preserve discipline and morale, and that he also has a privilege to rely upon credible information that a subordinate has acted improperly. The judge instructed the jury that Fitzgerald had such a privilege if "the actions are taken within the scope of one's employment responsibilities [and] are undertaken to advance legitimate business purposes of the employer." The point was adequately covered.

3, *supra,* the motion could not properly have been allowed because of Fitzgerald's alleged activities in thwarting Mailhiot's later job prospects.

The defendants have raised a myriad of evidentiary points. The most difficult of these concerns Mailhiot's testimony as to projected earnings increases that she failed to receive due to the discharge. She produced a chalk, which the jury saw but which has not been reproduced in the record, that projected annual increases of 10.8% over the period 1977 to 1985. According to that calculation, her lost earnings to the date of trial were $252,026. Mailhiot was competent to testify to the value of her services at that time she was fired. *Thibault* v. *DeVio,* 318 Mass. 605, 606 (1945). A plaintiff is likely to have first-hand knowledge of his prospects for promotion and so should be competent to testify to them. These considerations, however, do not extend to calculating a dollar figure for nine years into the future, especially since Mailhiot's express basis for calculating this — extrapolation from various raises she had had in the past — did not take into consideration such relevant factors as future inflation or price stability and likelihood of subsequent promotions. Nevertheless, the jury were obviously not much moved by it. The chalk in question supported an award of $252,026. Fitzgerald argued for no more than $141,000. The jury obviously took the extrapolation with a grain of salt, awarding only $95,000. In the circumstances we think that the extrapolation testimony and the illustrative chart cannot be said to have worked a prejudice sufficient to warrant a new trial. It would have been better if they had been excluded. They seem, however, to have played little part in the verdict.

We have examined the other evidentiary points raised by the defendants and have concluded that they are without merit.[5]

---

[5] The board minutes concerning Mailhiot's leaving the bank in 1973 were relevant to refute Fitzgerald's claim that Mailhiot had been forced out for cause. The article in "United States Banker," objected to as irrelevant, was relevant to show Mailhiot's reputation among bankers prior to her discharge. Lien's statement to Mailhiot about her exclusion from the May board meeting was admissible against the bank because Lien, as chairman of the board,

Mailhiot moved for attorney's fees, apparently relying upon
*M. F. Roach Co.* v. *Provincetown,* 355 Mass. 731 (1969).

---

had authority to speak for it. *Rosenston* v. *Bickford Shoes, Inc.,* 340 Mass.
769, 772-773 (1960). See Liacos, Massachusetts Evidence 291-292 (5th
ed. 1981). No instruction limiting the statement's use against Fitzgerald
was requested. Mailhiot's relation of how the bank examiners told her to
handle a certain problem was not hearsay. The instructions to her were not
assertions; they could not be true or false. Mailhiot's job search file and
résumé were relevant to show efforts to mitigate damages. The letters and
résumé were objected to as hearsay, but admitted only to show that they
were written, not that what they said was true. The defendants did not
request a limiting instruction, and cannot complain now. Her statement that
she took a psychological self-test and that the result of that is what led her
to consult a psychologist was in response to a question of why she consulted
a psychologist and was not a lay opinion about her state of mind. Mailhiot's
statement about her emotional state at time of trial was a proper lay opinion.
*Proulx* v. *Basbanes,* 354 Mass. 559, 562 (1968). Contrast *Jones* v. *Spering,*
334 Mass. 458, 460-461 (1956) (cause of nervous breakdown). See Liacos,
*supra* at 102.

The question put to Mailhiot's expert psychiatrist, on cross-examination,
whether an ambition for power can turn into ruthlessness, was apparently
irrelevant, and there was no suggestion of what the defendants were trying
to demonstrate by this line of questioning. On redirect, Mailhiot asked the
psychiatrist if he thought he could be fooled by her. This question was
dubious, but the negative answer it produced is not shown to have been
prejudicial to the defendants.

David Schulman, a vice president, was asked about what one Sullivan,
the deceased former treasurer, had to say about the draft reports which
Fitzgerald prepared. The defendants objected to this as hearsay not covered
by the exception for statements by a deceased declarant. The requirements
of the statute, G. L. c. 233, § 65, are that the declarant be dead, that he
be speaking of his own personal knowledge, and that the statements be in
apparent good faith. Defendants contend that good faith was not shown,
for Sullivan was himself discharged shortly after those statements. The
defendants, however, made no offer of proof as to the circumstances, such
as whether Sullivan knew at the time that he was on the way out. They did
not make any particularized objection to lack of personal knowledge and
may not do so here for the first time. In particular, even though opinions
may not come in under the statute, see *Little* v. *Massachusetts Northeastern
St. Ry.,* 223 Mass. 501, 503-504 (1916), this ground for objection was
never hinted at below.

The testimony of one Hinckley (a vice president at the Bank of Boston,
who had worked with Mailhiot) about Mailhiot's reputation in the banking
community referred to the time period 1976-1977, which was relevant.
Murphy, who had supervised Mailhiot at another bank, testified about her
job performance as his subordinate in the 1960's and early 1970's. Although
that time period was not relevant, the only objections below were to questions

The trial judge correctly denied them. The theory of allowing such fees in cases of intentional interference with contractual relations is that they are one of the elements of damages the defendant inflicted upon the plaintiff: i.e., the defendant not only caused the plaintiff to lose the benefit of his bargain, but also caused the plaintiff to be dragged into court against the third party. This rationale is clearest when the plaintiff must defend against a suit brought by a third party. See, e.g., *Mutual Fire, Marine & Inland Ins. Co.* v. *Costa,* 789 F.2d 83, 89-90 (1st Cir. 1986) (applying Massachusetts law). This is so even if the plaintiff loses against the third party, because he still had

---

seeking an assessment of her performance, and a supervisor is qualified to give an opinion about the merits of a subordinate's work.

Ben Schulman, a director, on cross, denied telling Fitzgerald that he wanted Mailhiot at the bank in order to protect his interests. The defendants attempted to ask Fitzgerald, on direct examination, if Schulman had so told him. This was objected to as hearsay. Hearsay was probably not the problem here, but this was an attempt to use extrinsic evidence to impeach a witness on a collateral matter. See *Leone* v. *Doran,* 363 Mass. 1, 14-15 (1973). There was no error in its exclusion.

The defendants offered the testimony of Simard, the current treasurer, that when she took over, the Master Card account was a mess and various people were not properly trained. This was excluded as irrelevant, because Fitzgerald had previously testified that these considerations had nothing to do with why he fired Mailhiot. In response to the judge's inquiry, the defendants could not suggest any theory why the offered testimony might be relevant. It is too late now to claim that it was relevant to refute Mailhiot's testimony about her diligent performance of her duties. Simard's proffered testimony about what people at the bank had to say about Mailhiot was inadmissible hearsay.

The remaining objections are similarly meritless. Some go only to the form of questions or answers, and no prejudice is shown (for example, Mailhiot's comment on overcharged interest, Schulman's statement that Mailhiot never wrote loans without authority, Hinckley's reaction to Mailhiot's inability to find work, questions to Mailhiot about her motive in looking into the accounting errors and why she delayed in consulting a psychologist, and a question to Fitzgerald about why he fired Mailhiot). Another relates only to interference with prospective contractual relations and thus is moot (Mailhiot's job search file, to the extent it was used to show that she would have found work elsewhere, were it not for Fitzgerald). Finally, some questions relate to evidence which either was cumulative or was later introduced in another fashion (a question to Mailhiot on her knowledge of Fitzgerald's motives, Schulman's testimony on the impropriety of capitalizing interest, and the fact that a law firm had to write off fees due from the bank).

to fight the suit. It also applies when the plaintiff is forced to sue to hold the third party to his bargain, as in the *M. F. Roach* case, *supra,* where the contractor was forced to sue the defendant town to recover compensation for the work already done. In this case, however, Mailhiot was not suing to hold the bank to the contract of employment or recover damages for its breach. She could not, because she was an at-will employee. (She could only prevail against the bank if she showed either that the bank had not paid her all that was due under her employment contract or that her discharge violated public policy.) She had no rights under her employment contract against the bank, and so she was not forced to sue to enforce nonexistent rights. Therefore, this case is not controlled by the *Roach* exception but by the general rule of *Chartrand* v. *Riley,* 354 Mass. 242 (1968), that counsel fees are not a proper heading of damages.

The order allowing the plaintiff's "motion for entry of a general verdict" and the amended judgment based thereon (docketed January 31, 1986) are reversed. The original judgment, docketed December 24, 1985, is to be reinstated and is affirmed. The order denying the plaintiff's motion for attorney's fees and disbursements is affirmed.

*So ordered.*